# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **GDONGALAY PARLO BERRY,** | ) | |
| | ) | |
| | ) | |
| **Petitioner,** | ) | **No. 3:17-cv-01033** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **TONY MAYS, Warden,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## MEMORANDUM OPINION

Gdongalay Parlo Berry, an inmate of the Riverbend Maximum Security Institution in Nashville, Tennessee, filed a pro se petition for a writ of habeas corpus under 28 U.S.C. § 2254 challenging his convictions and sentence in the Davidson County Criminal Court for two counts of first-degree premeditated murder, two counts of first-degree felony murder, two counts of especially aggravated kidnapping, and two counts of especially aggravated robbery for which Petitioner is serving consecutive life sentences plus fifty years in the Tennessee Department of Correction. (Doc. No. 1).

Presently pending before the Court is Respondent's answer to the habeas petition in which he asks the Court to dismiss the petition. (Doc. No. 35). Petitioner filed a response in opposition to the answer. (Doc. No. 39).

The petition is ripe for review, and this Court has jurisdiction pursuant to 28 U.S.C. § 2241(d). Having fully considered the record, the Court finds that an evidentiary hearing is not needed, and Petitioner is not entitled to relief. The petition therefore will be denied and this action will be dismissed.

## II.    Procedural History

Petitioner was convicted by a Davidson County jury of two counts of premeditated murder, two counts of felony murder, two counts of especially aggravated kidnapping, and two counts of especially aggravated robbery.  (Doc. No. 1, Attach. 1, at PageID 635).  Following a capital sentencing hearing, the court  imposed a sentence of death on each of the first-degree murder convictions based upon the jury's finding of three aggravating factors: prior violent felonies, murder committed for the purpose of avoiding prosecution, and murder committed during commission of a robbery or kidnapping.  State v. Berry, No. M2001-02023-CCA-R3-DD, 2003 WL 1855099,  at *1 (Tenn. Crim. App. Apr. 10, 2003).  The jury also found that these aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt.  Id.  The court subsequently imposed an effective fifty-year consecutive sentence on the remaining convictions. (Doc. No. 1, Attach. 1, at PageID 620-21, 631-34, 635-36).  After sentencing, the trial court merged each felony murder count into the premeditated murder counts for each respective victim, leaving Petitioner with two first-degree murder convictions.  State v. Berry, 141 S.W.3d 549, 553 n.1 (Tenn. 2004).

Petitioner appealed, and Tennessee Court of Criminal Appeals affirmed his convictions and sentences.  State v. Berry, 141 S.W.3d 549 (Tenn. 2004).  Pursuant to Tennessee Code Annotated § 39–13–206 (2003), an appeal was automatically docketed in the Tennessee Supreme Court.  After hearing oral argument, the Tennessee Supreme Court affirmed Petitioner's convictions and sentences.  141 S.W.3d 549, 554.

Petitioner then filed a pro se petition for post-conviction relief in state court. (Doc. No. 33, Attach. 39, at PageID 4341). Appointed counsel later filed an amended petition. (Doc. No. 33, Attach. 43, at PageID 4866).  With the aid of counsel, Petitioner also filed a second amended

petition for post-conviction relief adding new grounds for relief. Berry v. State, 366 S.W.3d 160, 167 (Tenn. Crim. App. 2012), perm. app. denied (Feb. 16, 2012). During the pendency of the post-conviction proceedings, Petitioner was granted post-conviction relief on a separate homicide conviction; that conviction had been used as an aggravating circumstance in Petitioner's death penalty case. (Doc. No. 33, Attach. 42, at PageID 4774). After an evidentiary hearing in the instant case on Petitioner's post-conviction petition, the post-conviction court affirmed the convictions but granted a new capital sentencing hearing, finding that the use of the vacated prior conviction as an aggravating factor was not harmless error. (Doc. No. 33, Attach. 42, at PageID 4774-4856).

On appeal, the Tennessee Court of Criminal Appeals affirmed the denial of the post-conviction petition and the ordering of a new sentencing hearing. Berry, 366 S.W.3d 160, 165. The Tennessee Supreme Court denied discretionary review. Id. at 160. The United States Supreme Court denied the petition for writ of certiorari. Berry v. Tenn., 568 U.S. 840 (2012).

Petitioner then filed a petition for writ of error coram nobis, alleging that the State committed a Brady violation by not disclosing the video interview of witness Yakou Murphy. (Doc. No. 33, Attach. 60, at PageID 9076-79). After an evidentiary hearing, the trial court denied the petition. (Doc. No. 33, Attach. 66, at PageID 9435). The Tennessee Court of Criminal Appeals affirmed the lower court's decision. Berry v. State, No. M2015-00052-CCA-R3-ECN, 2016 WL 1161216, at *1 (Tenn. Crim. App. Mar. 23, 2016), perm. app. denied (Mar. 23, 2016). The Tennessee Supreme Court denied discretionary review. Id.

The trial court stayed the resentencing proceedings on remand until Petitioner completed his appeal of the denial of error coram nobis relief. (Doc. No. 33, Attach. 77, at PageID 10180). At Petitioner's resentencing on the capital offenses, the State withdrew its notice of intent to seek

the death penalty and moved the court for consecutive sentencing. (Id. at 10162-63). After a hearing, the trial court imposed consecutive life sentences for the murder convictions. (Id. at 10178). The Tennessee Court of Criminal Appeals affirmed the new judgments. State v. Berry, No. M2017-00867-CCA-R3-CD, 2018 WL 3912302 (Tenn. Crim. App. Aug. 15, 2018), perm. app. denied (Aug. 15, 2018). The Tennessee Supreme Court again denied discretionary review. Id.

On June 23, 2017,[1] Petitioner filed a petition for writ of habeas corpus under 28 U.S.C. § 2254. (Doc. No. 1 at 24). By Order entered on September 7, 2017, the Court ordered Respondent to file an answer, plead or otherwise respond to the petition. (Doc. No. 7). Respondent filed a motion to dismiss the habeas corpus petition without prejudice because Petitioner's state court judgments were not yet final. (Doc. No. 11). The Court denied the motion to dismiss and stayed the habeas corpus proceedings while Petitioner completed his resentencing appeal in state court. (Doc. No. 21). Once those proceedings concluded, the Court reopened this case and ordered Respondent to file the state court record and respond to the habeas corpus petition. (Doc. No. 25).

Respondent filed a response to the habeas petition on May 3, 2019, in which he concedes that the petition is timely and asks the Court to dismiss the petition. (Doc. No. 35).

In his petition, Petitioner asserts these claims for relief:

1.      Petitioner's resentencing violated the Double Jeopardy Clause;

2.      The State engaged in misconduct and violated Brady v. Maryland by not disclosing:

    a.      The juvenile court record of Calvin Carter;

---

[1] Under the "prison mailbox rule" of Houston v. Lack, 487 U.S. 266, 270 (1988), and the Sixth Circuit's subsequent extension of that rule in Richard v. Ray, 290 F.3d 810, 812 (6th Cir. 2002) and Scott v. Evans, 116 Fed. App'x 699, 701 (6th Cir. 2004), a prisoner's legal mail is considered "filed" when he deposits his mail in the prison mail system to be forwarded to the Clerk of Court. Here, Plaintiff signed and dated his petition on June 23, 2017, although the Clerk's Office did not receive and file the petition until July 7, 2017. Under the prison mailbox rule, the Court considers June 23, 2017, as the date of filing.

b. The juvenile court record of Antonio Cartwright; and

c. The video-recorded interview of Yakou Murphy;

3. The trial court violated Petitioner's right to a fair trial and due process by automatically excluding members of the prospective jury panel who indicated that they could not impose the death penalty;

4. Petitioner received ineffective assistance of trial counsel because counsel failed to raise the State's failure to preserve the following evidence:

a. A video-recorded interview of Petitioner;

b. Fingerprint evidence from the murder weapon and guns stolen from the victims; and

c. The statement of James Frierson;

5. Cumulative errors in the state courts require reversal;

6. Petitioner was denied his right to a speedy trial; and

7. Petitioner is actually innocent. (Doc. No. 1).

## III. Summary of the Evidence

The Tennessee Court of Criminal Appeals summarized the proof adduced during the guilt phase of Petitioner's jury trial as follows:

The nineteen-year-old defendant, Gdongalay Berry, was convicted of the first-degree premeditated murders, kidnappings, and robberies of nineteen-year-old DeAngelo Lee and eighteen-year-old Greg Ewing. The State's proof showed that the defendant and a separately tried co-defendant, Christopher Davis, arranged to purchase weapons for $1200 from Lee and Ewing on the evening of February 27, 1996. Earlier that evening, the defendant and Davis were at Davis's apartment drinking and smoking marijuana with Ronald Benedict, Antoine Kirby, and Antonio Cartwright. Cartwright testified at trial that he overheard Davis and the defendant talking about robbing the two victims and taking their guns and automobile. Cartwright testified that the defendant stated, "If we rob 'em, we gotta kill 'em ... [b]ecause they know us." Between 7:30 and 8:00 p.m. that evening, after receiving a telephone call from Lee, the defendant, Davis, and two other men identified as "Kay" and "Sneak" left the apartment. Both the defendant and Davis were armed with guns—Davis with a 9mm handgun, the defendant with a .45 caliber handgun. Davis also carried a black bag containing handcuffs, rope, and

duct tape. Approximately thirty minutes later, Kay and Sneak returned to the apartment. Thirty to forty-five minutes after that, the defendant and Davis also returned. They were driving Lee's Cadillac and were carrying at least six assault weapons, some pagers, and clothing, including Lee's distinctive green and yellow tennis shoes, and Ewing's jacket. Davis was wearing a gold cross necklace that belonged to Lee. The defendant told Cartwright that "Chris [Davis] couldn't kill Greg [Ewing], so I had to," and announced that he had shot Ewing multiple times in the head. After placing the assault weapons under Davis's bed, the defendant and Davis left the apartment in Lee's Cadillac and another vehicle. They drove to a sparsely wooded residential area off a dead-end street, set fire to the interior of the Cadillac, and abandoned it. The men then went to a Nashville motel where they spent the night.

The next morning, Ewing's and Lee's bodies were found lying on a hill at a construction site in south Nashville near Interstate 440. Both victims were only partially clothed. A rope on the ground led up the hill to the body of one of the victims. Ewing had been shot three times in the head, twice in the shoulder, once in the neck, and once in the abdomen. Lee had been shot three times in the head and once in the hand. Ballistics testing showed that the weapons used to kill the victims were 9mm and .45 caliber handguns.

By coincidence, at approximately 9:00 a.m. on the same morning the victims' bodies were found, three detectives from the Metropolitan Police Department went to Davis's apartment to investigate an unrelated crime. While questioning two men present at the apartment, Ronald Benedict and Antonio Cartwright, the detectives noticed the automatic rifles under the bed in Davis's bedroom. At about this time, the defendant, Davis, Dimitrice Martin (Davis's girlfriend), and Brad Benedict (Ronald Benedict's brother), unexpectedly rushed through the front door. Davis was talking on a cell phone and had a .45 caliber handgun in his waistband. The defendant was carrying a fully loaded automatic rifle. Startled to see police present, the defendant, Davis, and Brad Benedict turned and fled out the front door. The detectives pursued them and caught Davis. Benedict and the defendant escaped, although the defendant dropped the rifle he had been carrying. This rifle turned out to be one of the weapons stolen from Lee and Ewing.

A subsequent search of Davis's apartment yielded a 9mm pistol underneath the cushion of the couch where Ronald Benedict had been sitting. Forensic testing later revealed that the 9mm caliber bullets recovered from the victims' bodies were fired from this gun. The .45 caliber gun used in the crime was never found. Among the items police found in Davis's bedroom were a pair of handcuffs with a key, a pager, a cell phone, a Crown Royal bag containing $1400 in cash, a black backpack, a large quantity of ammunition, Lee's green and yellow tennis shoes, Ewing's jacket, two .45 caliber pistols, two SKS rifles, and one Universal .30 caliber M–1 carbine. At the time of the search, however, officers were unaware that the items were connected to the murders of Ewing and Lee.

Davis and his girlfriend, Dimitrice Martin, were taken to the police station for questioning. Before his interview, Davis removed Lee's gold cross necklace and told Martin to put it in her purse. He also instructed Martin to call Ronald Benedict's girlfriend at the apartment and tell her to dispose of Lee's green and yellow tennis shoes.

As a result of the questioning of Davis and Martin, police discovered the connection between Davis, the defendant, and the murders of Lee and Ewing. The police took Lee's necklace from Martin. One of the detectives returned to Davis's apartment to retrieve Lee's tennis shoes and Ewing's jacket. While he found Ewing's jacket on Davis's bed, the tennis shoes were gone.

After the defendant was eventually arrested on March 6, 1996, he waived his Miranda rights and gave a statement to police in which he admitted that he had been with Davis when the victims were robbed and killed. He disavowed any active role in the crimes and claimed that he had not known Davis intended to kill the victims. According to the defendant, Davis and a third man, Christopher Loyal, had abducted Ewing and Lee after Ewing attempted to rob Davis. The defendant claimed that the victims were already handcuffed and restrained when he joined Davis and Loyal in the Cadillac. The group then drove to the construction site. Davis made the victims remove their clothing, and the defendant claimed he thought it would stop at that. As he watched, however, Davis and Loyal repeatedly shot the two men.

The jury returned a verdict at the conclusion of the guilt phase and found the defendant guilty of two counts of premeditated murder, two counts of felony murder, two counts of especially aggravated kidnapping, and two counts of especially aggravated robbery.

State v. Berry, 141 S.W.3d 549, 553-56 (Tenn. 2004). The Tennessee Court of Criminal Appeals summarized the proof adduced during the penalty phase of Petitioner's jury trial as follows:

During the penalty phase of trial, the State presented victim impact evidence through the testimony of the mothers of the two victims. Both mothers testified that they were close to their sons and that they missed their companionship. Ewing's mother, Brenda Sanders, testified that she did not know until the trial that her son had been shot seven times, or that he had screamed for his life prior to his death. She testified that it gave her a certain sense of closure to hear that evidence. There was no objection during the presentation of this victim impact evidence.

Next, the State presented certified copies of the defendant's 1994 conviction for aggravated assault, his two 1998 convictions for aggravated robbery, and his 1999 conviction for first-degree murder. The State also relied upon the proof presented during the guilt phase of the trial to support imposition of the death penalty.

Through the testimony of a mitigation expert and several members of his family, the defendant presented extensive information about his background. He was born prematurely on September 5, 1976, to Frieda Berry and Fred Black. His parents never married, and throughout his life he had only sporadic contact with his father, who served a ten-year prison sentence for robbery. When the defendant was a year old, his mother married Laurice Thomas, with whom she had two sons. The defendant's immediate family also included another, older half-brother, the child of the defendant's mother and a third man. The Thomas's marriage was described as hostile and volatile. Both Thomas and the defendant's mother had mental health problems. The defendant's mother was repeatedly institutionalized for mental illness and variously diagnosed with schizophrenia, depression with psychosis, and bipolar disorder. In 1982, while his wife and the children were present in the home, Laurice Thomas committed suicide by shooting himself in the bathroom. As a result, the defendant's mother had a mental breakdown, and the defendant and his half-brothers eventually went to live with their maternal grandmother and step-grandfather. At his grandmother's home, the defendant was part of a large family consisting of his siblings and aunts and uncles, who grew up with him like brothers and sisters. The defendant's grandmother and step-grandfather were described as hardworking people, who provided a good home for the defendant. After the defendant's mother remarried, the defendant's mother and grandmother engaged in litigation over the children's custody. The defendant's mother's second husband also committed suicide by jumping off a bridge and drowning.

The defendant had to repeat the fourth and eighth grades. He was described as a good boy, who did his chores and loved children. He participated in school sports and excelled at wrestling. At fourteen, the defendant was sent to an alternative school for fighting on the school bus and at school. His family testified that when he returned to high school the following year, he was singled out and strip searched. At the age of eighteen, while in the tenth grade, the defendant dropped out of school and left his grandmother's home. According to the defendant's family, the defendant's change in behavior occurred because of the bad influence of other teenagers. For a short time, the defendant lived with his older half-brother, but he was asked to move out because of visits from his friends, who sold drugs.

The defendant has one child, a son born on May 2, 1996. When he learned that his girlfriend was expecting a child, the defendant tried to commit suicide by overdosing on medication.

The defendant chose not to testify, and confirmed this decision during a jury-out hearing held pursuant to Momon v. State, 18 S.W.3d 152, 162 (Tenn.1999).

Dr. William Bernet, a forensic psychiatrist, interviewed the defendant and evaluated his mental status. Dr. Bernet noted that the defendant had three risk factors in his background. The first was a strong history of mental illness on both the maternal and paternal sides of his family. The second was a family history of

criminal behavior. The third was the defendant's disturbed and disorganized family life, based on his having a young, unmarried mother, his stepfathers' suicides, frequent moves, a large, complicated household, the custody dispute between his mother and grandmother, and the like. Dr. Bernet indicated that the defendant exhibited some paranoid tendencies, had experienced auditory hallucinations, and was depressed. Dr. Bernet also opined that the defendant had been intoxicated on the day of these crimes, and that all of the above factors had interfered with his judgment in participating in the offenses. Dr. Bernet noted that since the defendant's incarceration, he had been involved in four violent incidents; one, an attack on a fellow inmate, hurt the victim so badly that he was treated in the intensive care ward.

In rebuttal, the State called Dr. Thomas Schacht, a clinical and forensic psychologist. Dr. Schacht had interviewed and tested the defendant. Dr. Schacht opined that prior tests administered to the defendant by another psychologist and relied upon by Dr. Bernet were problematic and potentially invalid. For example, the defendant had exhibited "high inconsistency" on a test to determine if he was malingering. Also, the defendant had been permitted to take the Minnesota Multi–Phasic Personality Inventory in his prison cell and had not completed all the answers; the defendant refused to complete the answers for Dr. Schacht. Another test, the Structure Interview of Reported Symptoms, indicated that the defendant was not reporting his mental symptoms accurately and that there was a fifty to eighty-one percent chance that he was feigning mental illness. Nevertheless, Dr. Schacht conceded that testing indicated that the defendant had some paranoid traits and perhaps even suffered from a paranoid personality disorder. Dr. Schacht described the specifics of the four prior violent episodes in prison, which included, in addition to the above-described assault on the other prisoner, his breaking the sprinkler system in his cell and flooding his unit, creating a disturbance, and threatening and spitting on staff members. Dr. Schacht opined that there was no indication that the defendant was a follower. He also testified that there was no proven genetic relationship to criminal behavior, although a family history of mental illness is a risk factor. In Dr. Schacht's opinion, there was no connection between the defendant's background and the facts of this case.

At the conclusion of the penalty phase, the jury found the existence of three aggravating circumstances: (1) that the defendant was previously convicted of one or more felonies other than the present charge, the statutory elements of which involve the use of violence to the person; (2) that the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another; and (3) that the murder was knowingly committed, solicited, directed, or aided by the defendant while the defendant had a substantial role in committing or attempting to commit robbery or kidnapping. Tenn. Code Ann. § 39–13–204(i)(2), (6), (7) (1996). The jury also found that these aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt and imposed sentences of death for each of the murder convictions.

<u>State v. Berry</u>, 141 S.W.3d 549, 556-58.

**IV.    Standard of Review**

The petition in this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). The AEDPA was enacted "to reduce delays in the execution of state and federal criminal sentences . . . and to further the principles of comity, finality, and federalism." <u>Woodford v. Garceau</u>, 538 U.S. 202, 206  (2003) (internal citations and quotation marks omitted). As the Supreme Court explained, the AEDPA "recognizes a foundational principle of our federal system: State courts are adequate forums for the vindication of federal rights." <u>Burt v. Titlow</u>, 571 U.S. 12, 19 (2013).  The AEDPA, therefore, "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." <u>Id.</u>

One of the AEDPA's most significant limitations on the federal courts' authority to issue writs of habeas corpus is found in 28 U.S .C. § 2254(d).  Under the AEDPA, the court may grant a writ of habeas corpus on a claim that was adjudicated on the merits in state court if that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); <u>Williams v. Taylor</u>, 529 U.S. 362, 405 (2000).

The state court's factual findings are presumed to be correct and they can be contravened only if the petitioner can show by clear and convincing evidence that the state court's factual findings were erroneous.  28 U.S.C. § 2254(e)(1).  As the Supreme Court has advised, "[t]he question under AEDPA is not whether a federal court believes the state court's determination was

incorrect but whether that determination was unreasonable—a substantially higher threshold." Schriro v. Landrigan, 550 U.S. 465, 473 (2007) (citing Williams, 529 U.S. at 410). Review under § 2254(d) (1) "is limited to the record that was before the state court that adjudicated the claim on the merits." Cullen v. Pinholster, 563 U.S. 170, 182 (2011).

"Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b), thereby giving the State the 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." Baldwin v. Reese, 541 U.S. 27, 29 (2004) (citations omitted). "To provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim." Id. (citation omitted); Gray v. Netherland, 518 U.S. 152, 162–63 (1996) (the substance of the claim must have been presented as a federal constitutional claim). This rule has been interpreted by the Supreme Court as one of total exhaustion. Rose v. Lundy, 455 U.S. 509 (1982). Thus, each and every claim set forth in the federal habeas corpus petition must have been presented to the state appellate court. See Picard v. Connor, 404 U.S. 270, 275 (1971); see also Pillette v. Foltz, 824 F.2d 494, 496 (6th Cir. 1987) (exhaustion "generally entails fairly presenting the legal and factual substance of every claim to all levels of state court review").

Claims which are not exhausted are procedurally defaulted and "ordinarily may not be considered by a federal court on habeas review." Alley v. Bell, 307 F.3d 380, 388 (6th Cir. 2002). "In order to gain consideration of a claim that is procedurally defaulted, a petitioner must demonstrate cause and prejudice for the failure, or that a miscarriage of justice will result from the lack of review." Id. at 386. The burden of showing cause and prejudice to excuse defaulted claims

is on the habeas petitioner. Lucas v. O'Dea, 179 F.3d 412, 418 (6th Cir. 1999) (citing Coleman v. Thompson, 501 U.S. 722, 754 (1991)).

A petitioner may establish cause by "show[ing] that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." Murray v. Carrier, 477 U.S. 478, 488 (1986). Objective impediments include an unavailable claim or interference by officials that made compliance impracticable. Id. Constitutionally ineffective assistance of trial or appellate counsel may constitute cause. Murray, 477 U.S. at 488–89. Generally, however, if a petitioner asserts ineffective assistance of counsel as cause for a default, that ineffective assistance claim must itself have been presented to the state courts as an independent claim before it may be used to establish cause. Id. If the ineffective assistance claim is not presented to the state courts in the manner that state law requires, that claim is itself procedurally defaulted and can only be used as cause for the underlying defaulted claim if the petitioner demonstrates cause and prejudice with respect to the ineffective assistance claim. Edwards v. Carpenter, 529 U.S. 446, 452-53 (2000).

Petitioners in Tennessee also can establish "cause" to excuse the procedural default of a substantial claim of ineffective assistance by demonstrating the ineffective assistance of post-conviction counsel in failing to raise the claim in initial review post-conviction proceedings. See Martinez v. Ryan, 566 U.S. 1, 5-6 (2012) (creating an exception to Coleman where state law prohibits ineffective assistance claims on direct appeal); Trevino v. Thaler, 569 U.S. 413, 429 (2013) (extending Martinez to states with procedural frameworks that make meaningful opportunity to raise ineffective assistance claim on direct ap peal unlikely); Sutton v. Carpenter, 745 F.3d 787, 792 (6th Cir. 2014) (holding that Martinez and Trevino apply in Tennessee). The Supreme Court's creation in Martinez of a narrow exception to the procedural default bar stemmed from the recognition, "as an equitable matter, that the initial-review collateral proceeding, if

undertaken without counsel or with ineffective counsel, may not have been sufficient to ensure that proper consideration was given to a substantial claim." Martinez, 566 U.S. at 13. In other words, Martinez requires that the ineffective assistance of post-conviction counsel occur during the "initial-review collateral proceeding," and that "the underlying ineffective-assistance-of-trial-counsel claim [be] a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." See id. at 13-15. Importantly, Martinez did not dispense with the "actual prejudice" prong of the standard for overcoming procedural default first articulated by the Supreme Court in Coleman.

To establish prejudice, a petitioner must demonstrate that the constitutional error "worked to his actual and substantial disadvantage." Perkins v. LeCureux, 58 F.3d 214, 219 (6th Cir. 1995) (quoting United States v. Frady, 456 U.S. 152, 170 (1982) (emphasis in original)). "When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice." Simpson v. Jones, 238 F.3d 399, 409 (6th Cir. 2000) (citations omitted).

Because the cause and prejudice standard is not a perfect safeguard against fundamental miscarriages of justice, the Supreme Court also has recognized a narrow exception to the cause requirement where a constitutional violation has "probably resulted" in the conviction of one who is "actually innocent" of the substantive offense. Dretke v. Haley, 541 U.S. 386, 392 (citing Murray, 477 U.S. at 496).

**V.    Analysis**

With these principles in mind, the Court will turn to the examination of the claims raised in Berry's petition for habeas relief.

### A.    Double Jeopardy Claim

Petitioner alleges that his resentencing after the post-conviction court vacated his original death sentence violated the Double Jeopardy Clause. (Doc. No. 1 at 8-9).  The Double Jeopardy Clause serves the function of preventing both successive punishments and successive prosecutions. United States v. Ursery, 518 U.S. 267, 273 (1996). The protection against multiple punishments prohibits the government from "punishing twice or attempting a second time to punish criminally for the same offense." Witte v. United States, 515 U.S. 389, 396 (1995) (quoting Helvering v. Mitchell, 303 U.S. 391, 399 (1938)).

Respondent contends that this claim is procedurally defaulted because Petitioner did not raise it in the state court during the post-conviction or resentencing proceedings.  (Doc. No. 35 at 14).  In order to qualify as exhausted, a claim must have been presented to the state's highest court, Hafley v. Sowders, 902 F.2d 480, 483 (6th Cir. 1990), and must have been presented in a form which allows the state court a full and fair opportunity to rule on the claim. Justices of Boston Mun. Court v. Lydon, 466 U.S. 294, 302-303 (1984); Manning v. Alexander, 912 F.2d 878, 881 (6th Cir. 1990). A prisoner exhausts a claim by "fairly present[ing]" it to the appropriate trial and appellate courts. Baldwin v. Reese, 541 U.S. 27, 29 (2004).  "A petitioner can take four actions in his brief which are significant to the determination as to whether a claim has been fairly presented: (1) reliance upon federal cases employing constitutional analysis; (2) reliance upon state cases employing federal constitutional analysis; (3) phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleging facts well within the mainstream of constitutional law."  Newton v. Million, 349 F.3d 873, 877 (6th Cir. 2003) (internal quotation marks omitted), abrogated on other grounds by English v. Berghuis, 529 Fed. App'x 734 (6th Cir. 2013). "General allegations of the denial of rights to a 'fair

trial' and 'due process' do not 'fairly present' claims that specific constitutional rights were violated." McMeans v. Brigano, 228 F.3d 674, 681 (6th Cir. 2000) (citation omitted).

Petitioner did not raise a Double Jeopardy claim at trial, on direct appeal, in his petition for post-conviction relief, or on appeal of the denial of his petition for post-conviction relief. Thus, he has never presented the claim to any state court, and the time for raising the claim in the state courts has passed. See Tenn. Code Ann. § 40-30-106(g); Tenn. Code Ann. §§ 40-30-102(a), (c) (setting one-year limitations period for post-conviction relief). Petitioner is now barred by the post-conviction statute of limitations and restrictions on successive state petitions from raising the claim at this time.

Because Petitioner has never fully and fairly presented a Double Jeopardy claim to the state courts, and a state procedural rule prohibits the state court from extending further consideration to the claim, the claim is deemed exhausted (since there is no "available" state remedy) but procedurally defaulted from federal habeas review. See Coleman, 501 U.S. at 752-53. Contrary to Respondent's assertion (Doc. No. 35 at 14), Petitioner acknowledges his default of this claim and states that he "did not raise this issue due to ineffective assistance of counsel and the local Trail [sic] Court would not let me, the accused to present my legal interest because I was represented by counsel that felt the Double Jeopardy issue had no merit." (Doc. No. 1 at 9). The Court understands Petitioner's argument to be that trial counsel should have raised the Double Jeopardy claim and did not, therefore defaulting the claim but, under Martinez, Petitioner can establish the requisite cause and prejudice to excuse the procedural default because he received ineffective assistance of his post-conviction counsel.[2]

---

[2] Petitioner clarifies his procedural default argument in his response in opposition to Respondent's answer. (Doc. No. 39 at 2-3).

Martinez permits a petitioner to establish cause to excuse a procedural default of an ineffective assistance of trial counsel claim by showing that he received ineffective assistance by post-conviction counsel. See Martinez, 566 U.S. at 9. This holding, however, does not dispense with the "actual prejudice" requirement established by the Supreme Court in Coleman. 501 U.S. at 750. "That is, the petitioner must show both that his post-conviction counsel's performance was constitutionally deficient and that the petitioner was prejudiced by the deficiency." Thorne v. Hollway, No. 3:14–CV–0695, 2014 WL 4411680, at *22 (M.D. Tenn. Sept. 8, 2014) (quoting Clabourne v. Ryan, 745 F.3d 362, 376 (9th Cir. 2014)).

The Sixth Circuit has directed that a district court considering ineffective assistance of counsel claims under Martinez must first address whether the petitioner can demonstrate "(1) the absence or ineffective assistance of his post-conviction counsel and (2) the 'substantial' nature of his underlying [ineffective assistance of trial counsel claims]." Woolbright v. Crews, 791 F.3d 628, 637 (6th Cir. 2015). If the petitioner demonstrates these first two elements, the petitioner has established cause to excuse the procedural default, and the district court must next determine whether the petitioner can establish prejudice from the alleged ineffective assistance of trial counsel. Id. If the petitioner successfully establishes cause and prejudice, the final step is for the district court to evaluate the underlying ineffective assistance of trial counsel claims on the merits. Atkins v. Holloway, 792 F.3d 654, 659–60 (6th Cir. 2015).

As part of showing a substantial claim of ineffective assistance of trial counsel, the petitioner must prove prejudice under Strickland. See McGuire v. Warden, Chillicothe Corr. Inst., 738 F.3d 741, 752 (6th Cir. 2013) ("To be successful under Trevino, [petitioner] must show a 'substantial' claim of ineffective assistance, and this requirement applies as well to the prejudice portion of the ineffective assistance claim." (internal citations omitted)). Under Strickland, a

petitioner can prove prejudice by showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. 668, 694. The "actual prejudice" requirement of Coleman and the prejudice requirement of Strickland overlap such that

> in many habeas cases seeking to overcome procedural default under Martinez, it will be more efficient for the reviewing court to consider in the first instance whether the alleged underlying ineffective assistance of counsel was "substantial" enough to satisfy the "actual prejudice" prong of Coleman. If not, because the "cause and prejudice" standard is conjunctive rather than disjunctive, the reviewing court would have no need to consider whether the petitioner has established cause to overcome the procedural default, in the form of ineffective assistance of post-conviction counsel.

Thorne, 2014 WL 4411680, at *23. The Supreme Court has defined this "substantial" showing as requiring a petitioner to show that the claim has some merit. Martinez, 566 U.S. at 12-13 (citing Miller-El v. Cockrell, 537 U.S. 322 (2003)). The threshold inquiry at this stage "does not require full consideration of the factual or legal basis adduced in support of the claims"; rather, the court is required to engage in a preliminary, though not definite, consideration of the two-step framework mandated by Strickland. Miller–El, 537 U.S. at 336, 338.

As previously mentioned, under Martinez, the Court is required to undertake a preliminary analysis of Petitioner's underlying ineffective assistance of trial counsel claim in order to determine whether the claim has some merit. See Martinez, 566 U.S. at 12-13. Here, Petitioner argues that his trial counsel was ineffective for failing to raise a Double Jeopardy claim. The Supreme Court has held that resentencing after a prior capital sentence is vacated does not implicate Double Jeopardy concerns where the defendant was not "acquitted." Sattazahn v. Penn., 537 U.S. 101, 109 (2003). An "acquittal" at a trial-like sentencing phase, rather than the mere imposition of a life sentence, is required to give rise to Double Jeopardy protections. Id. at 107

(citing <u>Bullington v. Missouri</u>, 451 U.S. 430, 446 (1981)).  Like the defendant in <u>Sattazahn</u>, Petitioner cannot establish that the jury or the court "acquitted" him when the post-conviction court ordered that Petitioner be resentenced.

Because the resentencing of a defendant after a prior capital sentence is vacated does not implicate Double Jeopardy concerns where the defendant was not acquitted, as in Petitioner's case, Petitioner's trial counsel could not have succeeded had he pursued a Double Jeopardy claim. Petitioner therefore cannot establish that his underlying ineffective assistance of trial claim has merit and, consequently, Petitioner cannot establish cause to excuse the procedural default of his Double Jeopardy claim.  Petitioner has not met his burden of establishing that he is entitled to relief under Section 2254 with respect to this claim.  The claim will be dismissed.

## B. <u>Brady</u> Claims

Petitioner next alleges that the State committed <u>Brady</u> violations by failing to disclose the juvenile court records of Calvin Carter and Antonio Cartwright as well as the video-recorded interview of Yakou Murphy.  (Doc. No. 1 at 10-11).[3]  In <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." <u>Id</u>. at 87. "[T]here is never a real '<u>Brady</u> violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." <u>Strickler v. Greene</u>, 527 U.S. 263, 281 (1999). To establish a <u>Brady</u> violation, three conditions must be met:

---

[3] In opposition to Respondent's answer, Petitioner alleges that Respondent failed to respond to Petitioner's claims of prosecutorial misconduct and other claims.  (Doc. No. 39 at 6).  Petitioner raises the issue of prosecutorial misconduct in Ground Two of his petition, in which he also raises Brady claims, ineffective assistance of counsel claims, cumulative errors, and due process/fair trial claims.  (Doc. No. 1 at 10). Petitioner's allegations concerning improper conduct by the State are addressed in this section and in the following section of this Memorandum Opinion.

"The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." <u>Strickler</u>, 527 U.S. at 281–82.

Nondisclosed evidence must be material for prejudice to result. <u>Banks v. Dretke</u>, 540 U.S. 668, 698 (2004) (citing <u>Kyles v. Whitley</u>, 514 U.S. 419 (1995)). The Supreme Court has previously explained that "favorable evidence is material . . . 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" <u>Kyles</u>, 514 U.S. at 433 (quoting <u>United States v. Bagley</u>, 473 U.S. 667, 682 (1985)).

> The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

<u>Id</u>. at 434 (quoting <u>Bagley</u>, 473 U.S. at 678). "[T]he materiality of withheld evidence may be determined only by evaluating the evidence collectively." <u>Castleberry v. Brigano</u>, 349 F.3d 286, 291 (6th Cir. 2003). "Evidence that is 'merely cumulative' to evidence presented at trial is 'not material for purposes of <u>Brady</u> analysis.'" <u>Brooks v. Tenn.</u>, 626 F.3d 878, 893 (6th Cir. 2010) (quoting <u>Carter v. Mitchell</u>, 443 F.3d 517, 533 n.7 (6th Cir. 2006)).

According to Respondent, Petitioner's claim regarding Calvin Carter is not cognizable. Respondent acknowledges that the other two claims are properly exhausted; however, Respondent maintains that the state court's decision that a <u>Brady</u> violation did not occur was not an unreasonable application of clearly established Supreme Court precedent and was not based on an unreasonable determination of the facts in light of the record. (Doc. No. 35 at 14).

### 1.     Calvin Carter

Petitioner alleges that the State violated <u>Brady</u> by not disclosing the juvenile court record of Calvin Carter.  (Doc. No. 1 at 10).  Calvin Carter testified as a witness during Petitioner's trial for the murder of Adrian Dickerson.  <u>See</u> <u>State v. Berry</u>, No. M1999-00824-CCA-R3-CD, 2001 WL 1251240, at **3-4 (Tenn. Crim. App. Oct. 19, 2001), <u>perm. app. denied</u> (Tenn. Mar. 4, 2002). During the penalty phase in the instant case, the State relied on Petitioner's first degree murder conviction in the Dickerson case to establish the (i)(2) aggravating factor: "[t]he defendant was previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person." <u>See</u> <u>Berry</u>, 366 S.W. 3d at 184 (citing Tenn. Code Ann. § 39-13-204(i)(2)).  After it was proven that Calvin Carter presented perjured testimony during the Dickerson trial, Petitioner's murder conviction in the Dickerson case was vacated.  <u>See</u> <u>id.</u>  Because that prior conviction was set aside, Petitioner received post-conviction relief from his capital sentences in this case because the jury had relied on that prior conviction as an aggravating factor.  <u>Id.</u> at 183-85.  That reliance, found the court, could not be classified as harmless error.  <u>Id.</u> at 184.

Calvin Carter was not a witness in this case.  (<u>See</u> Doc. No. 33, Attachs. 15 to 19).  While his testimony in the Dickerson case  "clearly . . .  played a major role in the State's case for the death penalty" to Petitioner in this case, <u>Berry</u>, 366 S.W.3d at 185,  Carter's juvenile court record was not favorable or material under <u>Brady</u> with regard to Petitioner's **guilt** in this case.  As Respondent points out, to the extent Carter's juvenile record could be considered potential <u>Brady</u> evidence in this case with regard to the capital sentencing, Petitioner already has received any relief to which he would be entitled—a new sentencing hearing and a life sentence instead of a

death sentence.  Petitioner cannot be re-sentenced and receive a death sentence again. Therefore, this claim provides no relief to Petitioner and will be dismissed.

### 2.    Antonio Cartwright

Petitioner also alleges that the State violated Brady by failing to  disclose the juvenile court record of Antonio Cartwright.  (Doc. No. 1 at 10).  Cartwright was the State's principal witness in the prosecution of Petitioner for the deaths of DeAngelo Lee and Greg Ewing. Petitioner alleges that he could have used Cartwright's juvenile court record to impeach his credibility as a witness at trial because the records showed "that Cartwright had serious mental and emotional problems, a history of violent and assaultive behavior and a borderline I.Q."  (Doc. No. 33, Attach. 43, at PageID 5020-21; Doc. No. 33, Attach. 57, at Page ID 8470-71).

Petitioner raised this claim in his petition for post-conviction relief.  At his evidentiary hearing, he entered into evidence several hundred pages of documents relating to Cartwright's juvenile court record and his medical and mental health history.  Berry, 366 S.W.3d at 175. Petitioner argued that the prosecution had possession of Cartwright's juvenile court records and failed to disclose them to Petitioner's trial counsel.  (Doc. No. 33, Attach. 51, at PageID 7280-81). According to Petitioner, the juvenile court records contained numerous pieces of impeachment evidence.  (Id. at 7270-84).  Petitioner also asserted that the records contained information about Cartwright's mental health and substance abuse, which would have led trial counsel to discover Cartwright's mental health and medical records.  (Id. at 7281).  Petitioner contended that those records also contained numerous pieces of impeachment evidence.  (Id. at 7284-7306).  The State argued that it did not possess or have exclusive control of any of the records and that most of the evidence was immaterial because it would not have been admissible.  (Id. at 7309-12).

After the evidentiary hearing, the post-conviction court denied relief on the <u>Brady</u> claim related to Cartwright's records. (Doc. No. 33, Attach. 42, at PageID 4807-13). The court found that Petitioner specifically had requested records of the type later discovered by post-conviction counsel, many of the records arguably were favorable to the defense, and the State had failed to disclose the evidence. (<u>Id</u>. at 4809-11). The court concluded, however, that Petitioner had not established that the evidence was material under <u>Brady</u>. (<u>Id</u>. at 4811-13).

On appeal from the denial of post-conviction relief, the Tennessee Court of Criminal Appeals agreed with the post-conviction court that the record established that Petitioner had requested medical records, mental health records, and criminal histories for Cartwright, and this request satisfied the first prong of <u>Brady</u> "as it was a specific request for the material." <u>Berry</u>, 366 S.W.3d at 176. Rejecting Petitioner's claim that all of the later discovered documents relating to Cartwright's juvenile history were in the possession of the State and that the State had a duty to disclose them, the Court found that both parties would have had to utilize the same mechanism—a court order or subpoena—to access Cartwright's juvenile court records, and the prosecutor's office would not have had much more access to the juvenile court than trial counsel would have. <u>Berry</u>, 366 S.W.3d at 176-78. The court therefore found that Petitioner had failed to establish that the State withheld information that was in its exclusive possession or control. <u>Id</u>. at 179.

The state appellate court then assumed, for the sake of argument, that even if the State had suppressed this information, Petitioner's <u>Brady</u> claim failed because he had not established that Cartwright's juvenile court, mental health, and medical records were material. <u>Id</u>. at 180-82. With regard to the juvenile court records, the record showed that Cartwright had been adjudicated delinquent on three occasions for offenses including evading arrest, resisting arrest, loitering during school hours, acquisition of smoking materials, assault, vandalism, and violation of

probation—none of which could have been used to impeach the witness at trial. Id. at 180 (citing Tenn. R. Evid. 608, 609). The court noted that the fact that Cartwright remained in Department of Children's Services ("DCS") custody at the time of Petitioner's trial in 2000 could have been used to establish bias on the part of Cartwright, but trial counsel had elected not to pursue that route. Id. at 180. The court further concluded that any other potential impeachment evidence from the juvenile court record would not have undermined the verdict in light of the extensive impeachment of Cartwright's character and credibility that occurred at trial; Cartwright had "related to the jury his less-than-exemplary lifestyle, admitting drug and alcohol use as well as a membership in the Gangster Disciplines." Id. at 180. He had even characterized the victims' murders as "just life." Id.

With regard to Cartwright's mental health and medical records, the court found that none of those records would have rendered Cartwright incompetent to testify. Id. at 180-81 (citing Tenn. R. Evid. 601, 602, 603). The court explained that

> [t]he petitioner makes much of information contained in the documents relating to Mr. Cartwright's intelligence quotient and thought processes, claiming that the information calls into question Mr. Cartwright's competence to testify. The documents, however, were prepared in 1996 and 1997, years before the petitioner's trial in this case, and would have had little bearing on Mr. Cartwright's competence at the time of the petitioner's trial in 2000. Moreover, none of the documents evinces any fact that would have implicated Mr. Cartwright's competency to testify. Indeed, the rules of evidence presume that "[e]very person" is "competent to be a witness," Tenn. R. Evid. 601, including "children [and] mentally incompetent persons," Tenn. R. Evid. 601, Advisory Comm'n Comments. So long as the potential witness has personal knowledge about a matter, see Tenn. R. Evid. 602, and declares "that the witness will testify truthfully by oath or affirmation," Tenn. R. Evid. 603, the person may be accepted as a witness by the court, see State v. Carruthers, 35 S.W.3d 516, 576 (Tenn. 2000) ("The trial judge has the discretion to determine whether a witness is competent to testify.").

Berry, 366 S.W.3d at 180-81. The court also explained that Petitioner could not have been impeached with medical documents alleging that Petitioner witnessed the murder, contrary

to his testimony at trial, because there was no proof that Petitioner was the declarant of those statements. Id. at 181-82. In affirming the denial of relief, the Tennessee Court of Criminal Appeals ultimately concluded that, because Petitioner had failed to establish that the State suppressed Cartwright's juvenile, medical, and mental health records or that the records were material, Petitioner failed to establish a Brady violation. Id. at 182.

The state courts' findings did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law. First, the state courts properly relied on Brady and its progeny when evaluating Petitioner's claim. See id. at 175-82. The state courts reviewed all of the evidence and concluded that, although the State had failed to disclose evidence that Petitioner specifically had requested and that evidence arguably was favorable to the defense, Petitioner had not established that the State withheld information that was in its exclusive possession or control; Petitioner had the same access to Cartwright's juvenile records as the prosecution.

Further, the state courts reasonably concluded that Petitioner had not demonstrated materiality. Applying Tennessee Rules of Evidence 608 and 609, the courts properly determined that Cartwright could not have been impeached by any of his juvenile adjudications. Additionally, the courts reasoned that, to the extent any of Cartwright's juvenile, medical, or mental health records contained admissible impeachment evidence, those records would have been cumulative to evidence presented at trial. Even though that Cartwright remained in DCS custody at the time of Petitioner's 2000 trial could have been used to establish a potential for bias on the part of the witness, trial counsel chose not to pursue a line of questioning related to Cartwright's status. Moreover, Cartwright had been forthcoming in his testimony to the jury regarding his "less-than-exemplary lifestyle." Berry, 366 S.W.3d at 180. Therefore, any other potential impeachment

evidence from Cartwright's juvenile court record would not have put the whole case in such a different light as to undermine credibility in the verdict. See Kyles, 514 U.S. at 435. In light of this evidence, the state courts' decisions were not based on an objectively unreasonable application of clearly established federal law, as required by the AEDPA.

Neither did he state courts' findings result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Cartwright's juvenile adjudications did not involve dishonesty or false statements. (See Doc. No. 33, Attach. 55 at PageID 7723-26, 7737-38). The documents related to Cartwright's mental health diagnoses were prepared in 1996 or 1997 and would have had little bearing on Cartwright's competence at the time of Petitioner's trial in 2000. (See Doc. No. 33, Attach. 53, at PageID 7556-64; Doc. No. 33, Attach. 56 at PageID 8160-83). Other evidence, such as documents allegedly containing information that Cartwright witnessed the murders in this case, was inadmissible under state evidentiary rules or cumulative of evidence already introduced at Petitioner's trial. Finally, as noted by the Tennessee Court of Criminal Appeals, the "evidence of the petitioner's guilt was overwhelming." Berry, 366 S.W.3d at 182. Petitioner is not entitled to relief on this claim.

To the extent that Petitioner argues that the State's failure to disclose Cartwright's juvenile record violated state law (see Doc. No. 39 at 3), a claim that the state courts misapplied Tennessee law in convicting and sentencing Petitioner is not cognizable in a federal habeas petition. See 28 U.S.C. § 2254(a) (a federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States"). Error in the application of state law is not cognizable in a federal habeas proceeding. Estelle v. McGuire, 502 U.S. 62, 67–68 (1991) ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions"); Pulley v. Harris, 465 U.S. 37, 41 (1984) ("A federal

court may not issue the writ on the basis of a perceived error of state law."). Simply put, this Court cannot consider whether Berry was convicted or sentenced in violation of Tennessee law. See Smith v. Parker, No. 10-1158-JDB-egb, 2013 WL 5409783, at *30 (W.D. Tenn. Sept. 25, 2013) (dismissing as procedurally defaulted the petitioner's federal habeas claim that Tennessee courts misapplied state law in sentencing him where petitioner couched his claim to the state courts as arising under state law only). Petitioner is not entitled to relief on this claim.

### 3. Yakou Murphy

Petitioner also claims that the State did not disclose the March 14, 1996 video-recorded statement of Yakou Murphy, a witness who was at Davis's apartment on the night of the murders in this case. (Doc. No. 1 at 12). Petitioner asserts in his petition that he could have used Murphy's statement to police to contradict Cartwright's testimony that Petitioner and Davis were conspiring to commit robbery and murder before they met Ewing and Lee. In his response filed in opposition to Respondent's answer, Petitioner argues that "the defense needed Yakou Murphy's 'statement' to account for his codefendant's whereabouts" because Murphy's statement "presents this court with clear evidence that when petitioner left the apartment of the co-defendant they separated." (Doc. No. 39 at 4).

As referenced above, Cartwright testified at Petitioner's trial that Petitioner and Davis discussed robbing and killing the victims prior to the murders. (Doc. No. 33, Attach.16, at PageID 2607-09). He also testified that Petitioner admitted to killing the victims once he returned to Davis's house. (Id. at 2619-20). At Petitioner's error coram nobis evidentiary hearing, counsel introduced the video-recorded statement Yakou Murphy gave to police, which contradicted Cartwright's testimony. (Doc. No. 33, Attach. 69, at PageID 9688). As the error coram nobis court recounted:

On March 14, 1996, Mr. Murphy was interviewed by Detectives Mike Roland and Shellie Kendall in connection with the victims' murders and other, unrelated offenses. During that interview, Detective Roland informed Mr. Murphy that the Petitioner and Mr. Davis had been arrested for the murders of Mr. Lee and Mr. Ewing. Detective Roland also told Mr. Murphy that either the Petitioner or Mr. Davis had told Detective Roland that Mr. Murphy was present when Mr. Lee and Mr. Ewing were killed. Mr. Murphy denied knowing anything about the murders or being present when the victims were killed.

Mr. Murphy said he went to Mr. Davis's apartment around 2:00 or 3:00 p.m. on the day in question, but he could not recall who was at the apartment when he arrived. However, Mr. Murphy stated that Mr. Davis, the Petitioner, and "Sneak" came to the apartment and were "talking about trading or something or buying or something." Mr. Murphy thought they were preparing "to buy some guns or sell them or somethin'." At another point in the interview, Mr. Murphy said, "I know they supposed to made a trade or something for some guns[.]" At some point in the evening, Mr. Murphy left the apartment with the Petitioner, Mr. Davis, and Sneak, but they later returned to the apartment. Later in the evening, "everybody who was up in that house" left, leaving Mr. Murphy and Sneak in the apartment with a "dude and gal ... that live there."

Mr. Murphy was also at the apartment when the Petitioner, Mr. Davis, and others brought the guns back to the apartment and "laid them on the bed." Mr. Murphy also recalled that the Petitioner and Mr. Davis arrived in a grey or beige Cadillac, which Mr. Murphy thought was stolen. Mr. Murphy said he did not know everyone who walked in with the guns because he had begun socializing with Mr. Davis's group only recently.

Mr. Murphy maintained that he did not hear anyone say anything about killing another person when the Petitioner and Mr. Davis returned with the guns. Mr. Murphy explained that he was sitting on the couch when Mr. Davis and the Petitioner returned. Everyone else in the apartment followed the Petitioner and Mr. Davis into the bedroom with the guns. Curious, Mr. Murphy left the couch and joined everyone else in the bedroom to "see what was up[.]" Mr. Murphy insisted that he was the last person to leave the couch and go into the bedroom.

When he entered the bedroom, Mr. Murphy saw the guns laid out on the bed and everyone "was looking at them and then they was like [']we fixin' to get ready to go['] and everybody left" and spent the night in another location. Mr. Murphy insisted that the people in the room "weren't talking about nothing. They didn't say nothing." Detective Roland pushed Mr. Murphy to recall conversations he overheard, resulting in the following exchanges:

> Detective Roland: Come on now. Now there was somebody. There was, I've already talked to some of them people there and when

everybody was standing around and looking at the guns and stuff they was talking. You heard what they was [sic] talking about.

Mr. Murphy: They didn't tell me. That's what I'm saying.

* * *

Detective Roland: You heard stuff. You saw stuff or you were there when they killed them. It was one or the other. It has got to be one way or the other.

Mr. Murphy: Man, the only thing ...

Detective Roland: And if I go by what they say then I'm going to have to arrest you for criminal homicide.

Mr. Murphy: You ain't got to go by what they say when I, when I told you, I said.

Detective Roland: You ain't told me nothing yet.

Mr. Murphy: I told you I didn't see nothing, but I heard ...

Detective Roland: I'm asking you some specific questions. They are not going to bring in a bunch of guns and lay them down on the bed and everybody just stand there and look at it and then leave.

Mr. Murphy: I told you what I heard though. I told I heard that they were supposed to have been making a trade or a money deal or something.

Detective Roland: That was before. Now they have come back in with the guns.

Mr. Murphy: And I didn't hear nothing, man.

Detective Roland: And then you, you, do you think I'm stupid?

Mr. Murphy: No. Man, I know you ain't stupid.

Detective Roland: You are going to say there is a whole bunch of people standing around this bed and they lay these guns out and everybody looks at them and that is the end of that?

Mr. Murphy: Man, I promise. I promise, man, they said they had to make a gun trade or a gun deal, man, that's all.

Detective Roland: And that was before and you told me that.

Mr. Murphy: And that is what I heard.

Detective Roland: And now they left and you sat there at that apartment the whole time and then they come back—

Mr. Murphy: With some guns.

Detective Roland: —and they come back with some guns and they walk in and lay them on the bed and everybody looks at them and then they leave and that is it, didn't nobody say a word about the guns, where they came from, who they killed or whatever?

Mr. Murphy: They didn't say nothing like that. I just know they bought some guns. They supposed to have went and bought some guns and I thought they bought some guns.

* * *

Detective Roland: I'll tell you what I'm going to do, I'm going to leave it like you said that y'all looked at guns and that was it and nothing was said.

Mr. Murphy: That's what happened though.

Detective Roland: But that is not going to help you. That is not going to help you at all.

Mr. Murphy: Man, I'm, I'm telling you everything I know, man, I swear.

Detective Roland: Well, I find it, I find it hard to believe that nobody said nothing when they laid them guns on the bed, that nobody said nothing. I can't believe that. I will never believe that nobody didn't say anything.

Mr. Murphy: They didn't tell me about killing, man.

Detective Roland: I am not going to say that they sat down and said [']hey, K, this is what happened, we drove them off, we did this, and we did that, ['] but when all of them people were standing around that bed looking at these guns, somebody in that room was bragging, I know who it is and, I know what he said—

Mr. Murphy: They, they might have been bragging in that room.

* * *

Detective Roland: I'm tired of asking, but I will never in my life believe, and I don't think any Judge or jury is ever going to believe, that you stood there and looked at those guns and didn't hear anybody say nothing.

Mr. Murphy: All right. It was just, they was like looking at the guns and then, you know, it was like [']I want this one,['] uh-huh, like that, and then it was, [']naw, don't touch anything,['] like that. It was just stuff like that happening, but other than that they wasn't talking about nothing.

Detective Roland told Mr. Murphy that there was a possibility Mr. Murphy could be charged with the murder of Mr. Lee and Mr. Ewing. However, Mr. Murphy insisted that he did not have anything to do with the murders and did not know anything about them. The detectives also asked Mr. Murphy to look at several photographic lineups and identify anyone he saw in Mr. Davis's apartment on the night in question. Mr. Murphy was able to identify two photographs that he thought were of Mr. Davis and the Petitioner. However, one of those photographic lineups included Mr. Murphy's own photograph, but he was not able to identify himself until the detectives pointed it out.

Berry, 2016 WL 116126, at **5-7.

Murphy's statement was not disclosed to trial counsel because it was placed in the prosecutor's file for a different murder. (Doc. No. 33, Attach. 68, at PageID 9572, 9577-78, 9646-47; see Doc. No. 33, Attach. 1, at PageID 513). Nine years after the trial of Petitioner's co-defendant, the prosecutor informed the attorney who represented Davis during his post-conviction proceedings that he had found a videotape of Murphy's interview with the police. Berry, 2016 WL 116126, at *7. In 2012, after the Tennessee Court of Criminal Appeals had affirmed the partial denial of post-conviction relief and while he was preparing Petitioner's application to appeal to the Tennessee Supreme Court, Davis's attorney gave Petitioner's counsel a copy of Murphy's video-recorded interview. Id.

After a hearing, the error coram nobis court denied the petition and rejected the <u>Brady</u> claim. (Doc. No. 33, Attach. 66, at PageID 9435-55). Reviewing the trial transcript, the court concluded that Murphy's statement was cumulative to the testimonies of Martin and Loyal, both of whom said that they did not hear Petitioner or Davis discussing robbery or murder before the killings. (<u>See id</u>. at 9450-53). The court also noted that Cartwright was impeached at trial through testimony regarding his gang membership and through his own pretrial statement to the police, in which he said both that Petitioner said nothing about the offenses and Petitioner admitted to killing Ewing-- which contradicted his trial testimony. (<u>See id</u>. at 9454). The court further noted that Murphy's statement presented "significant credibility concerns" because of his "evasive and uncooperative demeanor" in the video. (<u>Id</u>.) Finally, although Petitioner argued that, had trial counsel known about Murphy's interview, trial counsel could have used that information to pursue other strategies and interview other witnesses, the coram nobis court found that the Petitioner had not identified those potential witnesses, had not indicated what information they might have developed, or "how such information and resulting defense tactics might have led to a different outcome at trial." <u>Berry</u>, 2016 WL 1161216, at *11.

On appeal of the denial of Petitioner's petition for writ of error coram nobis, the Tennessee Court of Criminal Appeals agreed with the lower court that Murphy's statement was "merely cumulative to the evidence presented at trial." <u>Id</u>. at *13. The appellate court also agreed that Murphy's statement lacked credibility because he "gave evasive answers, demonstrated an uncooperative demeanor, and was unable to identify himself in a photographic lineup." <u>Id</u>. The court noted that it was "clear from the video that Mr. Murphy was attempting to distance himself from any involvement in the murder . . . ." <u>Id</u>. The appellate court also agreed with the lower court that Murphy's statement would not have appreciably aided the impeachment of Cartwright that

occurred at trial. See id. The court observed that Murphy's statement would have harmed the defense because the statement corroborated the State's alternative theory of felony murder. See id. at *14.

The Tennessee Court of Criminal Appeals also found that, although Petitioner contended that he could have used Murphy's statement to cross examine witnesses at trial, called Murphy as a witness, argued the inconsistencies between Murphy's and Cartwright's accounts during closing argument, or asked for a missing witness instruction regarding the failure of the State to call Murphy, Cartwright's testimony was not the only incriminating evidence against Petitioner with regard to premeditation. See id. As the court explained:

> Taking Mr. Cartwright's testimony out of consideration, the Petitioner was still seen leaving the apartment with handcuffs, rope, and duct tape to meet the victims in order to steal their guns. Id. The victims were found in a remote location, partially undressed, and a rope left at the scene indicated the victims had been bound. Id. Both victims were shot multiple times with a nine-millimeter and a .45 caliber handgun, the same caliber weapons Mr. Davis and the Petitioner were carrying when they left the apartment. See id. at 554–55, 566. Finally, the Petitioner returned to the apartment in Mr. Lee's car with multiple assault weapons, deposited the weapons at Mr. Davis's apartment, and then left to burn Mr. Lee's car and spend the night at a hotel. Id. at 566. The Petitioner returned the next morning to find police in Mr. Davis's apartment and then fled the scene. Id. at 566–67.

Berry, 2016 WL 1161216, at *13. For those reasons, the state appellate court concluded that Petitioner had failed to establish that there was a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different; stated differently, the court found that the evidence was immaterial under Brady. Id. at *14.

The Tennessee Court of Criminal Appeals did not unreasonably apply clearly established Supreme Court precedent by denying relief on this claim. The state court relied on Brady and its progeny when evaluating Petitioner's claim, see id. at *14, and reviewed Murphy's statement in the context of the evidence in the record. In so doing, the court determined that Murphy's statement

was merely cumulative, lacking in credibility, and equally prejudicial to Petitioner. Consequently, the state court reasonably concluded that Murphy's statement was not material under <u>Brady</u>.

The court's findings are supported by the record. Both Martin and Loyal testified at trial that they were at Davis's house with Cartwright and Murphy and they did not hear either Petitioner or Davis talk about killing the victims before or after the crimes, making Murphy's statement that he did not hear Petitioner discussing robbery or murder before the killings cumulative. (<u>See</u> Doc. No. 33, Attach. 17, PageID 2833-34, 2039-40, 2842-43, 2848-51, 2856-58; Doc. No. 33, Attach. 18, PageID 2877-80, 2885, 2908). Although Petitioner contends that Murphy's statement would have presented "clear evidence" that Petitioner left Davis's apartment separately, supporting Petitioner's alibi defense (Doc. No. 39 at 4), that is not what Murphy testified; he testified at Petitioner's error coram nobis evidentiary hearing that Petitioner and Davis left the apartment together. In any event, Murphy's statement lacked credibility; during his video-recorded statement, Murphy was evasive, dishonest with the detectives, and demonstrably motivated by self-preservation. (<u>See</u> Doc. No. 33, Attach. 69, PageID 9688-9756; Doc. No. 33, Attach. 70, PageID 9759-81).

Furthermore, Murphy corroborated the testimony of Cartwright and other witnesses at trial that Petitioner and Davis were contemplating a firearms transaction and later returned to Davis's house with guns and a Cadillac, corroborating the State's alternate felony murder theory. (<u>See</u> Doc. No. 33, Attach. 69, PageID 9699-9706, 9737, 9739, 9742-48). Even Davis's post-conviction counsel testified at Petitioner's evidentiary hearing that Murphy's video-recorded statement would not have changed the outcome of Davis's trial, considering that "there was a lot of evidence." <u>Berry</u>, <u>Berry</u>, 2016 WL 1161216, at *9. Thus, the state court's application of federal law was not

objectively unreasonable under the deference afforded by AEDPA. Therefore, Petitioner is not entitled to relief on this claim.

### C. Fair Trial and Due Process Claims

Petitioner claims that the trial court violated his right to a fair trial and due process when the court automatically excluded members of the prospective jury panel who indicated that they could not impose the death penalty. (Doc. No. 1 at 14-15).

Petitioner raised this claim on direct appeal. Berry, 2013 WL 1855099, at *18. The Tennessee Court of Criminal Appeals found that each prospective juror was extensively questioned as to whether he or she could apply the law to the evidence and consider all forms of punishment in the case. Id. After reviewing the answers and responses of the challenged jurors, the Tennessee Court of Criminal Appeals concluded that the jurors at issue were either properly rehabilitated or their answers left "no leeway for rehabilitation." Id. (quoting Strouth, 620 S.W.3d at 471 and Alley, 776 S.W.2d at 517-18). The state court's findings were not erroneous.

Even if the state court had committed error by excluding those jurors, because Petitioner's death sentence was vacated, he is no longer subject to the death penalty for the crimes in this case. See Hill v. Sheets, 409 F. App'x 821, 824 (6th Cir. 2010) (citing James v. Singletary, 995 F.2d 187, 188-89 (11th Cir. 1993) (holding that a federal habeas petition challenging sentencing was mooted when the state courts resentenced the petitioner)); see also Susdorf v. McQuiffin, No. 2:10-11661, 2011 WL 479749, at *5 (E.D. Mich. Feb. 7, 2011) (finding that the state court of appeals' decision ordering that the amended judgment of sentence be corrected in conformance with Michigan law moots the petitioner's sentencing claim); see Jones v. Rapelje, No. 08-cv-13286, 2010 WL 4366884, at *7 (E.D. Mich. Oct. 28, 2010) (finding that state court of appeals' order that petitioner be resentenced, and fact that the petitioner had been resentenced accordingly, moots petitioner's

ineffective assistance of counsel claim predicated on the sentencing guidelines). Therefore, this claim is moot, and Petitioner is not entitled to relief on this claim.

### D. Ineffective Assistance of Counsel Claim

Next, Petitioner alleges that the State failed to preserve several pieces of evidence including a video recording of his police interview on March 6, 1996; fingerprints from the murder weapon and the guns stolen from the victims; and the statement of James Frierson,[4] which Petitioner alleges would have provided corroborating evidence of Petitioner's alibi for the night of the murders. (Doc. No. 1 at 17-19). Petitioner contends that trial counsel's failure to raise these spoliation of evidence claims prevented Petitioner from being able to assert an alibi defense and receive a fair trial. (Doc. No. at 17-19). He states that, in preparing for his suppression hearing, he told trial counsel about his video-recorded interview of March 6, 1996, in which he told detectives that he was at his mother's house during the time of the crimes. (Doc. 1 at 17). Petitioner wanted to use the video-recorded interview additionally to demonstrate "how upset the detective Roland got," proving that his interview was coercive. (Id.) Petitioner further contends that trial counsel should have raised the fact that the crime scene investigator did not test for fingerprints on all the guns used in the crimes or on other objects found at the crime scene, nor did he attempt to collect trace evidence from the clothing found at the apartment; Petitioner believes this evidence, if it had been obtained, would have supported his defense. (Id. at 17-18). Petitioner alleges in his response to Respondent's answer that the 9-millimeter gun had been used by Murphy in another murder. (Doc. No. 39 at 4). In addition, Petitioner alleges that the testimony of Frierson would have supported Petitioner's alibi, but trial counsel either did not obtain or use it. (Id. at 18).

---

[4] Frierson testified against Petitioner's co-defendant in a different case. See State v. Davis, No. 01C01-9710-CR-00506, 1999 WL 61598 (Tenn. Crim. App. Feb. 9, 1999).

Petitioner acknowledges that he failed to exhaust his state remedies with regard to this claim. (Doc. No. 1 at 19). He states that his post-conviction appellate counsel "abandoned this issue due to disregard of the petitioner's legal interest." (Id.) In other words, although he does not employ the terms of art to which attorneys are accustomed, Petitioner alleges that the ineffectiveness of his post-conviction appellate counsel constitutes cause for the procedural default of his ineffective assistance of trial counsel claims based on the failure to pursue theories of defense related to the spoliation of evidence and Frierson's testimony.

It is well settled that the ineffective assistance of counsel during post-conviction appeal does not constitute cause to overcome procedural default. Coleman, 501 U.S. 722, 742-53 (1991); Martinez, 566 U.S. 1, 18. Here, however, Petitioner did not have "'his day in court on this claim'" because his ineffective assistance of trial counsel claims were not adjudicated during the initial review post-conviction proceeding. See Smith v. Carpenter, No. 3:99-cv-0731, 2018 WL 317429, at *13 (M.D. Tenn. Jan. 8, 2018), appeal filed (6th Cir. Feb. 6, 2018) (quoting Arnold v. Dormire, 675 F.3d 1082, 1087 (8th Cir. 2012)). Consequently, like Martinez, Petitioner could have argued that attorney errors at his initial post-conviction proceeding established cause for the default of Petitioner's ineffectiveness of trial counsel claims. But Petitioner does not make that argument.

Nevertheless, even if the Court liberally construes the pro se petition to allege that the ineffectiveness of Petitioner's initial-proceeding post-conviction counsel establishes cause to excuse the procedural default of Petitioner's ineffective assistance of trial counsel claims, Petitioner cannot prevail because he cannot show that the underlying ineffectiveness of trial counsel claims are substantial.

With regard to trial counsel's performance, during his pre-trial preparations, counsel should have recognized that there was not a video recording of Petitioner's interview, that certain guns

had not been tested for fingerprints, and that trace evidence had not been collected by the crime scene investigator. Because this ineffective assistance claim has not been previously raised, there is no testimony in the record as to why trial counsel did not investigate these issues. In his petition, Petitioner alleges that his trial counsel made efforts to find Frierson prior to his trial, indicating that trial counsel knew Frierson was a potential alibi witness. (Doc. No. 1 at 19). Further, Frierson's testimony in the preliminary hearing in the Davis case was included on the same recording of the preliminary hearing in this case at which Cartwright testified, demonstrating that trial counsel should have been aware of Frierson's testimony. (See Doc. No. 33, Attach. 56; see also Doc. No. 34). However, even assuming for purposes of this analysis that trial counsel's performance was constitutionally deficient,[5] Petitioner still has not established prejudice as a result of trial counsel's performance in this respect. Petitioner has not shown that the evidence he believes trial counsel should have pursued "could reasonably be taken to put the whole case in such a different light as to undermine the confidence in the verdict." Kyles, 514 U.S. at 435.

First, with respect to Petitioner's conviction for premeditated murder, the proof adduced at trial established that, on February 27, 1996, Petitioner and Davis were drinking alcohol and smoking marijuana at Davis's apartment in Nashville. Other individuals also were present at the apartment, including Antonio Cartwright, Yakou Murphy, Christopher Loyal, and Dimitrice Martin, Davis's girlfriend. Petitioner and Davis planned to meet with the victims to purchase assault rifles for $1,200.00. Prior to meeting with the victims, Petitioner and Davis decided to rob the victims of guns and their vehicle. According to Cartwright, Petitioner stated, "If we rob 'em, we gotta kill 'em . . . . Because they know us." Martin and Loyal testified to the contrary, stating that they did not hear Petitioner or Davis discussing robbery or murder before the killings.

---

[5] The Court makes no such finding.

After receiving a call from Lee, Petitioner and Davis left the apartment to meet Lee and Ewing, carrying guns and a black bag containing handcuffs, a rope, and duct tape. After about an hour to an hour and fifteen minutes later, Petitioner and Davis returned to Davis's apartment in the victims' Cadillac with at least six assault style rifles, pagers, and clothes, including green and yellow tennis shoes that belonged to Lee and a jacket that belonged to Ewing. Davis was wearing a gold cross necklace, which belonged to victim Lee. Petitioner and Davis brought the rifles into the apartment and placed them under Davis's bed. Cartwright testified that he heard Petitioner say: "Chris couldn't kill Greg, so I had to" and that, referring to the Cadillac, "We gotta burn it." Petitioner and Davis left the apartment and spent the night in a local hotel.

Lee and Ewing were found dead the next morning at a construction site. Their bodies were not fully clothed. Ewing had been shot seven times, three times in the head. Lee also had been shot in the head three times, as well as once in the hand. There was a rope on the ground near the bodies.

On that same morning, police went to Davis's home during a different investigation. Officers saw the assault rifles under the bed. While the police questioned Cartwright and another individual, Davis and Petitioner entered the apartment. Davis had a .45 caliber handgun, and Petitioner had a loaded assault rifle. When the two men saw the police, they fled. The police caught Davis, but Petitioner escaped. As he ran, Petitioner dropped the assault rifle, which was from the stash of weapons taken from the victims. Petitioner remained at large for approximately one week.

Police later found a 9-millimeter handgun underneath a couch cushion in Davis's apartment. Although Petitioner alleges that "[t]he 9mm pistol was proven to be use[d] by Murphy by Murphy's own testimony in the trial of Donald Moore v. State of Tennessee," (Doc. No. 39 at

4),[6] the forensic testing introduced into evidence during Petitioner's criminal trial revealed that the 9-millimeter caliber bullet recovered from the victims' bodies were fired from this gun. State v. Berry, 141 S.W.3d 549, 555 (Tenn. 2004). The .45 caliber bullets were not connected to any weapon found in Petitioner's possession. The police also found handcuffs, a pager, $1400 in cash, a black backpack, Lee's tennis shoes, Ewing's jacket, ammunition, handguns, and rifles.

Davis and Martin were questioned at the police station. While they waited, Davis removed Lee's necklace and told Martin to put it in her purse. He also told her to call someone at the apartment to hide Lee's tennis shoes. The police recovered the necklace from Davis's girlfriend, but the tennis shoes were never recovered.

When later interviewed by police, Petitioner admitted that he accompanied Davis and another individual to Ewing's residence. According to Petitioner, Ewing attempted to rob them, which caused Davis to subdue him and Lee; the group then went to the construction site, where Davis ordered the victims to strip; and Davis and the other man robbed and killed the victims. Petitioner told the police he was not involved in the murders and thought Davis was going to release the victims unharmed.

After viewing the evidence in the light most favorable to the State, the Tennessee Court of Criminal Appeals concluded that a reasonable trier of fact could have found Petitioner guilty of the first degree premeditated murders of Ewing and Lee based upon either Petitioner's own conduct or under a theory of criminal responsibility for the conduct of co-defendant Davis or both.

---

[6] In the trial referenced by Petitioner, forensic test results showed that bullets connected to the murder of the taxi driver victim were fired from a 9-millimeter pistol belonging to Yakou Murphy. State v. Moore, No. 01C01-9801-CR-00032, 1999 WL 226227, at *4 (Tenn. Crim. App. Apr. 20, 1999). However, Petitioner does not refute the accuracy of the forensic tests that were introduced during his trial for the murders of Ewing and Lee. Neither does he explain why Murphy could not have used the pistol to shoot the taxi driver and Petitioner could not have used the *same* pistol to shoot Ewing and/or Lee.

Petitioner does not explain how the omission of his video-recorded interview had any impact on the outcome of his case, given the significant evidence in support of his guilt. Although he alleges that Frierson's testimony and Murphy's statement would have supported his alibi defense (specifically, that Petitioner was not seen in the company of Davis at or near the time of the crimes) (Doc. No. 39 at 4), the Court already has determined that Murphy's statement was not reliable and, more importantly, Petitioner admitted to police that he accompanied Davis and another individual to Ewing's residence on the night of the crimes. Petitioner has not submitted any proof that further investigation of his alibi would have led to additional exculpatory facts that could have been admitted at either trial or post-conviction, or any evidence about whether trial counsel or post-conviction counsel conducted that investigation, or why they omitted these facts from their presentations in state court. Petitioner has the burden of demonstrating that his counsel's actions were not the product of informed strategy. Strickland, 466 U.S. at 688-89. Petitioner has not carried that burden.

Petitioner argues that, if counsel had challenged the lack of fingerprints and trace evidence collection at the crime scene, counsel could have shown that the presence of prints or trace evidence that was not his own revealed someone else's guilt. However, unidentified prints do not preclude a defendant's presence at the same location, and such evidence "is not exculpatory because it cannot be said that such evidence is inconsistent with the prosecution's case or [that it] tends to support the defendant's case." Carter v. City of Detroit, No. 11-15322, 2016 WL 319514, at *4 (E.D. Mich. Jan. 27, 2016), aff'd, 678 Fed. App'x 290 (6th Cir. 2017). Neither Petitioner nor any other evidence offered by Petitioner disputes the physical evidence establishing that the 9-millimeter pistol recovered by police at Davis's apartment was one of the weapons which produced the victims' fatal wounds. Because Petitioner cannot establish any prejudice in

connection with his underlying ineffective assistance of trial counsel claim, the claim lacks the merit required for further consideration under <u>Martinez</u>.

Next, with regard to Petitioner's conviction of the offenses of felony murder and especially aggravated robbery, felony murder is defined as "the killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, or aircraft policy." Tenn. Code Ann. § 39–13–202(2). Robbery is the "intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39–13–401 (1997). In order for the robbery to become especially aggravated robbery, the robbery must be accomplished with a deadly weapon and the victim must suffer serious bodily injury. Tenn. Code Ann. § 39–13–403 (1997).

Antonio Cartwright testified that Petitioner and Davis discussed their plan to rob and murder the victims a few hours before executing it. Martin and Loyal testified to the contrary. The evidence overwhelmingly established that Petitioner and Davis took the victims' car, rifles, jewelry, clothing, and other items. This taking was accomplished with at least one deadly weapon, and the victims suffered death as a result of Petitioner's actions. The Tennessee Court of Criminal Appeals determined that this evidence was sufficient to find Petitioner guilty of the especially aggravated robberies and resulting felony murders of Ewing and Lee. Even if the Court were to credit Petitioner's argument that he did not participate in the killing of the victims, Petitioner admitted to being present during the robbery and killing of the victims. This admission alone is sufficient to support Petitioner's convictions of especially aggravated robberies and felony murders. In light of this admission and the other evidence adduced at trial, Petitioner cannot show that the evidence he believes trial counsel should have pursued "could reasonably be taken to put

the whole case in such a different light as to undermine the confidence in the verdict." Kyles, 514 U.S. at 435.

Finally, with regard to Petitioner's conviction for especially aggravated kidnapping, especially aggravated kidnapping is false imprisonment accomplished with a deadly weapon or where the victim suffers serious bodily injury. Tenn. Code Ann. § 39–13–305(a)(1), (4) (1997). False imprisonment occurs when a person "knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." Tenn. Code Ann. § 39–13–302 (1997). The evidence showed that Davis left his apartment carrying a black bag which contained handcuffs, rope, and duct tape. At some point during the evening, the victims were bound and transported to the construction site. Furthermore, rope was found at the murder scene. While it is unclear who actually bound the victims, the overwhelming evidence shows that Petitioner actively participated in the planning, preparation, and execution of the robbery, kidnapping, and murder of the victims. The Tennessee Court of Criminal Appeals concluded that this evidence was sufficient to support the especially aggravated kidnapping convictions under a theory of criminal responsibility. Petitioner has not shown that the evidence he believes trial counsel should have pursued would have cast the whole case "in such a different light as to undermine the confidence in the verdict." Kyles, 514 U.S. at 435.

Petitioner has not established that his underlying ineffective assistance of trial counsel claims have merit and, consequently, Petitioner cannot establish cause to excuse his procedural default. Thus, Petitioner's ineffective assistance of counsel claims based on the failure to challenge spoliation of evidence must be dismissed.

### E. Cumulative Error

Petitioner alleges that the cumulative errors in his state court proceedings require a reversal of his conviction. (Doc. No. 1 at 10). However, the law of this Circuit is that cumulative error claims are not cognizable on habeas review. See Daniels v. Jackson, No. 18-1342, 2018 WL 4621942, at *6 (6th Cir. July 17, 2018) (quoting Williams v. Anderson, 460 F.3d 789, 816 (6th Cir. 2006)) ("[T]he law of [the Sixth Circuit] is that cumulative error claims are not cognizable on habeas [review] because the Supreme Court has not spoken on this issue."). Petitioner's claim is not cognizable and therefore must be dismissed.

### F. Speedy Trial Claim

Petitioner also alleges that he was denied his constitutional right to a speedy trial. (Doc. No. 1 at 17). According to Petitioner, "[t]he speedy trial violation hindered the recovery of the complete interrogation video to where the petitioner did not receive an [sic] fair shoot [sic] at trial to allow the jury to view the coerciveness of the interrogation and the petitioner[ 's] alibi defense. Preventing the petitioner's right to defense, right to due process of a fair trial." (Id.)

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial...." U.S. Const. amend. VI. "The purpose of the speedy-trial guarantee is to protect the accused against oppressive pre-trial incarceration, the anxiety and concern due to unresolved criminal charges, and the risk that evidence will be lost or memories diminished." Brown v. Romanowski, 845 F.3d 703, 712 (6th Cir. 2017). "The remedy for a Sixth Amendment speedy-trial violation is dismissal with prejudice." United States v. Sutton, 862 F.3d 547, 554 (6th Cir. 2017). The Supreme Court has articulated a four-factor balancing test to determine whether a defendant has been denied the right to a speedy trial. Barker v. Wingo, 407 U.S. 514, 530-31 (1972). The reviewing court must consider: (1) the length of the delay; (2) the

reason for the delay; (3) the defendant's assertion of his right to a speedy trial; and (4) the prejudice resulting to the defendant from the delay. Id.; United States v. Pena, 724 Fed. App'x 413, 420 (6th Cir. 2018).

> Petitioner raised this claim on direct appeal, arguing as follows:
>
> First, the delay in filing the death penalty notice greatly hampered his ability to prepare a "death-defense" by assembling mitigation evidence and experts. Second, the delay in the trial was vital because crucial witnesses who were involved in this criminal episode, most notably Antonio Cartwright, had an inordinately long period of time in which to craft their putative testimony and make it favorable to themselves and most damaging to Defendant.

Berry, 2003 WL 1855099, at *8. In analyzing this claim, the Tennessee Court of Criminal Appeals first noted that Petitioner raised this claim for the first time on appeal but, given that the case was a capital case, the court elected to consider the claim anyway. Id. The court found that the approximate four year and two month delay between the date of Petitioner's arrest and the date on which his trial began satisfied the requirement of presumptive prejudice, which weighed only slightly in favor of Petitioner. Id. at *9. The court further found that it was "unable to conduct a meaningful review of the remaining Barker factors" because no evidentiary proceedings were held in the trial court. Id.

In finding that Petitioner had failed to demonstrate prejudice from the delay, the state appellate court found that Petitioner was represented by counsel throughout his proceedings and had not asserted his right to a speedy trial at any time; there was no evidence in the record that the delay affected Petitioner's ability to prepare an appropriate defense; and there was no evidence that the delay allowed Cartwright to "craft [his] testimony so as to exculpate [himself] and condemn Defendant," as Petitioner had alleged. Id. The court therefore concluded that the four year delay between Petitioner's arrest and trial did not violate his constitutional right to a speedy trial. The Tennessee Supreme Court affirmed, finding that even though "the length of the delay is

presumptively prejudicial, the defendant's failure to assert his right to a speedy trial and the lack of prejudice support a finding of no error." Berry, 141 S.W.3d at 569.

Petitioner again raised this claim on denial of his petition for post-conviction review, and the post-conviction court denied relief. Berry v. State, 366 S.W.3d. 160.  On appeal of the denial of post-conviction relief, the Tennessee Court of Criminal Appeals agreed with the post-conviction court that, "even under the most liberal of constructions, none of the documents exhibited by the petitioner can be read to assert a speedy trial demand." Id. at 170.  Moreover, the court found that, even if it were to conclude that Petitioner had asserted his right to a speedy trial, Petitioner had failed to prove that the State sought the delay to gain a tactical advantage or any prejudice from the delay, both necessary factors under the four-part test announced in Barker.  Id. at 171.

With regard to Petitioner's claim that the State manufactured the delay so it could procure an erroneous first degree murder conviction against the petitioner in an unrelated murder case for use as an aggravating factor and to send State witness Antonio Cartwright to custodial drug and alcohol rehabilitation in preparation for his testimony against the petitioner at trial, the Tennessee Court of Criminal Appeals found that Petitioner had failed to present any proof to support either allegation.  Id.  Finally, and identified as most importantly by the state appellate court, Petitioner failed to establish any prejudice to his case as a result of the delay in bringing it to trial.  Id. Petitioner had not alleged any claim or witness lost to the passage of time, any detriment to the preparation or presentation of his defense, or any other fact that might be construed as prejudice resulting from the delay in this case.  Id.  As a result, the court found that Petitioner was not entitled to relief on this claim.

The Court finds that the state courts' decisions were not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

Furthermore, given the evidence and testimony adduced at trial, the Court finds that the state courts' decision to reject Petitioner's speedy trial claim was not an unreasonable application of the law. The appellate court correctly cited the applicable federal standard of review from <u>Baker</u> and reasonably decided the claim against Petitioner. Petitioner therefore is not entitled to habeas relief on this claim.

### G. Actual Innocence Claim

Finally, Petitioner appears to assert an actual innocence claim, arguing that he has an alibi and his interrogation was coercive. (Doc. No. 1 at 17-18). A claim of actual innocence is not itself a constitutional claim but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits. <u>Herrera v. Collins</u>, 506 U.S. 390, 404 (1993). The actual innocence exception is very narrow in scope and requires proof of factual innocence, not just legal insufficiency. <u>Bousley v. United States</u>, 523 U.S. 614, 623 (1998).

Here, to the extent Petitioner is asserting a freestanding actual innocence claim, his claim would be a claim of actual innocence that is not used to excuse the procedural default of another claim. Although the Supreme Court has suggested that it may recognize freestanding actual innocence claims in capital cases, <u>see</u> <u>Herrera</u>, 506 U.S. at 417, it has not done so in non-capital cases such as this one. Thus, on its face, Petitioner's contention fails to state a claim upon which habeas relief can be granted, as the Supreme Court has never ruled that a freestanding actual innocence claim is cognizable in a non-capital case.

Moreover, the actual innocence exception is only applied in the most extraordinary of cases; the Sixth Circuit has explained that, "if a habeas petitioner 'presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error, the petitioner should be allowed

to pass through the gateway and argue the merits of his underlying claims.'" <u>Souter v. Jones</u>, 395 F.3d 577, 590 (6th Cir. 2004) (quoting <u>Schlup v. Delo</u>, 513 U.S. 298, 316 (1995))." Thus, the threshold inquiry is whether "new facts raise[ ] sufficient doubt about [the petitioner's] guilt to undermine confidence in the result of the trial." <u>Schlup</u>, 513 U.S. at 317. To establish actual innocence, "a petitioner must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." <u>Id</u>. at 327. The Court has noted that "actual innocence means factual innocence, not mere legal insufficiency." <u>Bousley v. United States</u>, 523 U.S. 614, 623 (1998). "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial." <u>Schlup</u>, 513 U.S. at 324. The Court counseled however, that the actual innocence exception should "remain rare" and "only be applied in the 'extraordinary case.'" <u>Id</u>. at 321.

Petitioner has presented no new credible evidence to suggest that he is actually innocent of the crimes of which he was convicted. Thus, he is not entitled to relief on an actual innocence claim.

**VI.    Conclusion**

For the reasons set forth herein, the petition filed by Gdongalay Berry seeking relief under § 2254 will be denied, and this action will be dismissed with prejudice.

Federal Rule of Appellate Procedure 22 provides that an appeal of the denial of a habeas petition may not proceed unless a certificate of appealability (COA) is issued under 28 U.S.C. § 2253. Rule 11 of the Rules Governing § 2254 Cases requires that a district court issue or deny a COA when it enters a final order. A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this

standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." <u>Miller–El</u>, 537 U.S. at 327. The district court must either issue a COA indicating which issues satisfy the required showing or provide reasons why such a certificate should not issue. 28 U.S.C. § 2253(c)(3); Fed. R. App. P. 22(b).

Because jurists of reason would not disagree with the resolution of Petitioner's claims, the court will deny a COA.

An appropriate Order will be entered.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE